IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

2015 JUL -6 PM 2: 04

| | | |
|---|---|---|
| MICHAEL T. PAUL,<br>*Plaintiff*,<br>v.<br>CITY OF SAN ANTONIO<br>BY AND THROUGH THE BOARD OF<br>CPS, CPS ENERGY,<br>*Defendant.* | § § § § § § § § | CIVIL ACTION NO.<br>15-cv-173-DAE<br><br>JURY TRIAL DEMANDED |

## PLAINTIFF MICHAEL T. PAUL'S
### SECOND AMENDED COMPLAINT FOR BREACH OF CONTRACT

1. Complainant, Michael T. Paul is a resident of Comal County Texas and occupant of premises at 9123 Easy Street, San Antonio, Texas 78266 which is deeded as Johnny H. and Shirley A Paul Trust and did enter into a contract with defendant to sell excess generated power from solar array through an interconnect agreement dated August 9, 2015 and signed by Adan V. Gonzales of CPS Energy and the Trust Administrator Scott A. Paul. (Contract attached as exhibit 1)

2. Upon information and belief, Defendant City of San Antonio by and through the CPS Board, "CPS Energy", is a Texas Corporation having a place of business at 145 Navarro St, San Antonio, TX 78205. "CPS Energy" supplies natural gas and retail electricity to over one million customers in 5 counties in southern Texas and has designated Jackson Walker, LLc. located at 112 E. Pecan Street, suite 2400, San Antonio, Texas 78205, as it's agent for service of process in Texas.

3. CPS Energy has installed thousands of Smart Meters to date along with a mesh network that connects the electric Smart Meters to various collection points strategically located throughout its service territory. The customers' usage information and other customers information is then transmitted from the collection points to CPS Energy's computer center over a cellular telephone network for billing and management purposes. As part of the mesh network, the electric Smart Meters act as a relay for each other so that when one meter is unable to communicate with the collection point, the data transmission is relayed by one or more of the other meters. Each collection point provides two-way data.

communications to as many as 5,000 electric Smart Meters located in the same geographic area. The gas Smart Meters communicate directly with CPS Energy's computer center over a separate cellular telephone network. CPS Energy Project Manager Tracy Hamilton in an exclusive Upon completion of the a system-wide deployment, 740,000 smart electric- and 360,000 smart gas-meters will be in use by 2018 said, CPS Energy Project Manager Tracy Hamilton in an exclusive interview.

4. The Smart Meter deployment has drawn heavy criticism from CPS Energy's customers complaining about health and safety concerns as well as a number of other issues. Most striking is the fact that when Smart Meters are installed on certain customers' homes, they become ill and, in some instances, it has become necessary for them to seek medical attention.. There are also customers that have become disabled to the point that they are unable to work at their regular occupations. CPS Energy has received letters from doctors explaining that there are people who suffer from electromagnetic sensitivity, and the Smart Meters may cause them harm. However, CPS Energy has refused to acknowledge the medical issues, and take action to solve the problem. Customers have also sent letters to the Public Utility Commission, but they have no regulation over CPS Energy over issues not involving grid reliability. As a result, those customers are being subjected to a new technology that is extremely harmful to them, and have no recourse. CPS Energy has allowed this situation to continue to the point where some customers have removed their Smart Meter, and installed an analog meter in its place. CPS Energy has responded by threatening those customers with federal and state criminal prosecution for "tampering" with the meters, then proceeded to disconnect their power for reasons other than non-payment.

5. CPS Energy has chosen to ignore the public outcry, and continues to install Smart Meters. This has led to protests by home owner associations, and surrounding cities official's objecting to Smart Meters being installed in their communities which created negative publicity in the media. In addition, a number of counties in other states have enacted moratoriums in an attempt to stop Smart Meter installations in their jurisdictions, and many cities have joined in that effort by enacting ordinances to accomplish the same thing. There is ongoing proposed legislation at the state level to try and resolve this controversy.

6. Despite all these problems, CPS Energy continues to claim that the Smart Meters are safe, and do not cause health impacts or other problems. Only CPS Energy single family residential customers may exchange meters under the Smart Meter X-change Program. The customer's account must not have more than three (3) cut offs for non-payment in a twelve (12) month period in order to qualify for this Program. In order to maintain eligibility in this Program, the customer's account must not exceed three (3) cut offs for non-payment in a twelve (12) month period. Distributed Energy Resources (DER) customer accounts are ineligible for this Program.

Unfortunately, there is no guarantee that the alternative proposed by CPS Energy to disconnect the radio transmitter in the Smart Meters will be an adequate solution because, among other things, the Smart Meters in the customers' neighborhoods will still have radio frequency ("RF") transmitters. This is extremely important for people that suffer from electromagnetic sensitivity because they have an adverse reaction when they are exposed to RF radiation levels that are substantially lower than current guidelines established by the Federal Communications Commission ("FCC")

Fifth Cause of Action

(Unlawful Use of Customers' Property)

11. CPS Energy is using an electric Smart Meter installed on one customer's premises to serve other customers as part of the Smart Meter deployment without that customer's knowledge and consent. As explained in Paragraph 3 above, one customer's Smart Meter can be relaying two-way data transmissions for as many as 5,000 neighbors' Smart Meters to CPS Energy's collection point. In this example, the customer's Smart Meter may be operating almost continuously in order to transmit data to and from the other Smart Meters in the mesh network. As a result, the customer is being exposed to considerably more RF radiation than CPS Energy has represented. Moreover, it is unlawful for CPS Energy to transmit a customers information to those not authorized to receive it absent the originating customer's consent. Texas H.B. No. 2129 was passed by the House on April 13, 2005 and passed by the Senate, with amendments, on May 24, 2005. (see Exhibit 2).

Sixth Cause of Action

(Excessive Conduction)

12. The Smart Meters installed by CPS Energy re conducting excessive RF interference onto the customer's electrical wiring. This is referred to as "dirty electricity," and can be responsible for tripping ground fault interrupters, interfering with home security systems, baby monitors, and other electronic devices on the customer's premises. These conditions can cause electrical shock, electrocution, damage to the customer's appliances, wiping of RPROM memory, and fires. In this instance, the dirty electricity is caused by the switching-mode power supply and possibly other components in the Smart Meter. The

dirty electricity also flows onto the electrical wiring from the customer's premises to neighbors' homes that are served by the same distribution transformer.

## Seventh Cause of Action
## (Excessive RF Radiation)

13. As part of the Smart Meter deployment, CPS Energy is offering customers the option of a feature called Home Area Network ("HAN"). There is a separate transmitter and receiver in the Smart Meter that operate in the unlicensed portion of the radio spectrum at 2.4 gigahertz to support this capability. Under this arrangement, if the customer's appliances are equipped with a communications chip, they will be able to communicate with each other and the Smart Meter to schedule usage times to conserve energy. Ultimately, this would be done automatically: that is, certain appliances would run at different times during the day and night to avoid peak demand periods. For example, the customer's air conditioner would be shutoff when an electric dryer is in use or vice-versa. Unfortunately, the duty cycle for the HAN transmitter is estimated to be 100 times greater than the duty cycle of the RF transmitter in the electric Smart Meter operating at 902 to 928 MHz as part of the mesh network. As a result, there will be substantially more RF radiation in customers' homes and the surrounding area. However, CPS Energy is not warning its customers about the potential health risks of activating the HAN feature. Also Distributed Energy Resources (DER) customers those interconnected providing solar and/or wind generated power under NET METERING having two separate SMART meters installed labeled "PRODUCTION"and "BILLING" that has the same communications system in each doubling the amount of possible exposure at any given

7

moment to the customer. Add to that any home devices operating at the same time and you can see that it is not plausible for CPS Energy to claim the statement in paragraph 7.

### Eighth Cause of Action
### (Failure to Investigate Customer Complaints)

14. As stated earlier in this complaint, CPS Energy refuses to investigate customer complaints that Smart Meters are causing them health problems. As a result, some customers have incurred substantial medical bills for doctor visits, blood tests, Magnetic Resonance Imaging (MRI) scans, CAT Scans, and other attempts to diagnose their medical problems. In many instances, doctors have attributed the problem to electromagnetic sensitivity caused by Smart Meters installed on the customer's property. However, CPS Energy refuses to accept this possibility, and work toward finding a possible solution. Unfortunately, CPS Energy customers do not have any recourse because their electric service is only available from CPS Energy. CPS Energy has a legal obligation to provide safe and reliable service to its customers, and has breached that responsibility in a careless and negligent manner.

### Ninth Cause of Action
### (ADA Violation)

15. CPS Energy is completely ignoring the rights of customers that suffer from electromagnetic sensitivity. These customers are entitled to an accommodation (relief) under the Americans with Disabilities Act ("ADA"). CPS Energy must not refuse to offer those customers a conventional analog meter or other solutions to solve their medical problems even though they may not have a letter from their doctor confirming

8

the condition. Some customers with electromagnetic sensitivity are receiving disability benefits from the Social Security Administration, but the payments they obtain do not restore the quality of life they enjoyed before Smart Meters were installed on their property. While others may be receiving benefits for other disabilities which are compounded by Microwave Radiated Radio Frequencies. And still others may be receiving no benefits at all since the process to apply and be approved can take multiple of years due to a backlog in hearings.

## Tenth Cause of Action

### (Customer Discrimination)

16. CPS Energy has no legal authority to charge customers for replacement of equipment the customer does not own. This involves the installation of an analog meter at no cost to the customer. As a rule, CPS Energy states that the utility owns the meter and the customer incurs the investment price to supply the meter box and everything before the POCC (Point of Common Coupling) which is where the electric service is spliced to the customers wire usually just before the weather head in overhead service entrances or inside a raceway before the meter box in an underground service entrance. As such CPS Energy is not extending the same consideration to all of its customers regarding the opt out ability. Other issues involving the refusal to allow DER owners to opt out is also discriminatory. For the last 25 to 30 years SOLAR has been interconnected to the grid with no switching capability before the advent SMART TECHNOLOGY and there was no issue claiming the instability in the balancing of power was in any ways due to SOLAR PV systems. In fact IEEE had specific manufacturing guidelines that ensured

the Inverters would not provide power to the line in the event of grid outage to protect the lives of lineman, however with the development of on demand resourcing that can now control SMART INVERTERS to access stored power in a battery during PEAK to have more capacity for the grid that doesn't have to be compensated for if it is converted to VAR to inject into the power stream known as balancing. Or the shedding of VAR to balance the power on the line which is dumped off the line into a solar array to dissipate. Which can occur at any time, day or night. If done during the day then the system is NOT generating any real Power for which the owner is compensated limiting the amount of generated watts that the customer would have been compensated for. And the Shedding or injecting at night implies the same non compensated uses but the customer also must accept the fact that their private equipment they invested in is now being used for what has been labeled in the back office of the utilities as "Ancillary Services". Uses not originally designed by the manufacturers and engineered into the service life estimates that are the basis for the lengths of the warranties of the equipment. And then when a repair issue arises the manufacturer claims the owner has violated the warranty and therefore the warranty is void.

## Eleventh Cause of Action
(Complainant Hospitalized from extreme EMF exposure from SMART METERS)

17. Michael T. Paul having sustained damage to entire home fresh potable water system from High levels of Iron born bacteria had to go into debt at a cost of over $800.00 to pay for the remediation necessary to return the system to as close to normal as he could get it due

10

to the EPROM (Electronic Programmed Read Only Memory) chip on his TERMINOX being wiped from a high power magnetic signal propagating every electrical circuit causing the system to default to an un-programmed state that didn't back flush contaminants every 24 hours as programmed. Manufacturer stated the memory is supposed to be STATIC to prevent that very thing from happening. When asked what could make that happen the service engineer from budgetwater.com which supports their products for life stated he had never heard of that happening. Even if the unit were unplugged from an electrical source for weeks, months even years as soon as it is energized the static memory sets the operating parameters to the last active state when it was d-energized. Specifically to prevent contamination of a customer's water supply should a power outage occur? When Mr. Paul asked if a High energy pulsed magnetic electrical signal were sent through the 230 electric circuit would that cause it to erase the EPROM. And the reply was "that is the only way it could happen except for an EMP from a nuclear detonation in the same hemisphere and everyone would have experienced it.

## Twelfth Cause of Action
(Remote Commands received that were controlling Solar Array)

18. Beginning the first time in April 2013 Mr. Paul has 1 entry on the event log that states "REMOTE POWER UP" but not having any more for 4 to 6 weeks attributed it to an error in the log system until July 1 which begins logging events almost every single day and sometimes multiple events within the same 24 hour cycle. Mr. Paul even found the entire system active at 12 midnight and as early as 5am appearing to show DC voltage in excess of the 52volt DC set point that causes the inverter to connect to the grid as if it

11

were generating from the sun. and since his battery bank was only 48 volt DC couldn't belive when he saw amounts close to 75 volts across all three charge controllers which represented power across every single solar panel of which there were 36. Mr. Paul at first didn't understand what he was seeing at the time. He know knows through research he conducted on the DOE.gov, the Sandilabs.gov, and the NIST.gov websites that his system had been hijacked by someone remotely that was causing undue wear and tear to system that was unauthorized using the Smart Meter to track the operations and report the outcomes to CPS Energy's switching operator terminal in near real time.

## Thirteenth Cause of Action
### (Complainant Hospitalized from extreme EMF exposure)

19. Mr. Paul October 2, 2014 plaintiff was taken by ambulance to the Methodist Hospital Emergency room with symptoms of cardiac arrest. After 22 hours which required blood samples every half hour for the first 18 hours, 2 cat scans, infusion of numerous medications was given a chemically induced stress test that was returned negative nd allowed to return home. The cost of which was $43,000 plus an additional $1180.00 for the ambulance which plaintiff is still being billed by the City of San Antonio. After having received high exposure from two different smart meters installed and because of a titanium plate surgically implanted along the sciatic nerve on the femur of his right leg is now considered a sensitive receptor to high levels of exposure electro-magnetic microwave radiation. Also known as FLUX.

## PRAYER FOR RELIEF

WHEREFORE, premises considered Complainant requests the following relief:

20. With respect to the First Cause of Action (Misleading Representation):

    (a) An order by the Court requiring CPS Energy to reduce the effective radiated Power ("ERP") for all electric Smart Meters installed (or to be installed) in its service area to one watt or less;

    (b) An order by the Court requiring that the reduction in ERP for the electric Smart Meters already installed shall be completed within one year from the effective date of this order. Electric Smart Meters installed after that date shall not exceed the one watt or less ERP requirement as well;

    (c) An order by the Court requiring CPS Energy to provide a progress report to Complainant and the Court every (60) days for the first six months from the effective date of this order setting forth how many electric Smart Meters have been adjusted in accordance with (a) above; then once every 6 month thereafter until all meet the 1 watt ERP and not to exceed a total 24 months to complete adjustments and the work carried out by licensed utility linemen employed with CPS Energy only;

    (d) An order by the Court requiring CPS Energy to charge the cost of performing the reduction in ERP as stated in (a) and (b) above to its Executive's Bonus Account's suspending bonus payouts until total amount has been recouped;

13

   (e) An order by the Court imposing a sanction against CPS Energy in an amount not less than $750,000 for the misrepresentation referred to in the First Cause of Action;

   (f) Any sanction imposed by the Court against CPS Energy shall be charged as described in prior order 20(d);

21. With respect to the Second Cause of Action (UL Misrepresentation):

   (a) An order by the Court requiring CPS Energy to obtain UL registration for all electric Smart Meters installed (or to be installed) in its service area as well as such registration for the communications modules in its gas meters installed (or to be installed) throughout its service area;

   (b) An order by the Court requiring CPS Energy to stop installing electric Smart Meters and communications modules in gas meters in its service area without UL registration;

   (c) An order by the Court requiring CPS Energy to charge the cost for the UL registration (and related work) to be paid as in prior orders 20(d) and 21(f);

   (d) An order by the Court requiring CPS Energy to complete UL registration for electric Smart Meters and communications modules in gas meters to be same and run concurrent with order 20(c);

   (e) An order by the Court requiring CPS Energy to pay a sanction in the amount

of not less than $750,000 for its misrepresentation concerning UL registration as set forth in the Second Cause of Action; and

(f) Any sanction imposed by the Commission against CPS Energy shall be charged same as prior orders 20(d), 20(f), and 21(c);

22. With respect to the Third Cause of Action (Failure to Disclose Smart Meter Dangers):

(a) An order by the Court requiring CPS Energy to identify all electric Smart Meters that have been installed in its service area and issue a notice to its customers for the Smart Meters about the dangers that they may experience from the Smart meter within one hundred and twenty (120) days from the effective date of this order;

(b) An order by the Court requiring that the wording for the notice be approved by Complainant and the Court before it is distributed by CPS Energy to its customers

(c) An order by the Court requiring CPS Energy to pay a sanction in the amount of not less than $750,000 for not disclosing the electric Smart Meter possible dangers as set forth in the Third Cause of Action; and,

(d) Any sanction imposed by the Court against CPS Energy shall be charged same as prior orders 20(d), 20(f), 21(c), and 21(f);

15

23. With respect to the Fourth Cause of Action (Misrepresentation Concerning FCC Guidelines):

   (a) An order by the Court requiring CPS Energy to inform all of its customers that have an electric Smart Meter installed on their property that FCC guidelines relating to MPE to RF radiation do apply to their meters. Therefore, there is a question as to whether the meters are safe with respect to health impacts and requiring CPS Energy to issue the notice within one hundred and twenty (120) days from the effective date of this order to run concurrent with prior order 20(a) ; and;

   (b) An order by the Court requiring that the wording for the notice be approved by Complainant and the Court before it is distributed by CPS Energy to its customers;

   (c) An order by the Court requiring CPS Energy to pay a sanction in the amount of not less than $750,000 for not disclosing the electric Smart Meter possible dangers as set forth in the Fourth Cause of Action; and,

   (d) An order by the Court requiring CPS Energy to provide its customers that are concerned about MPE from their electric Smart Meter the right to have an analog meter instead.

   (e) Any sanction imposed by the Commission against CPS Energy shall be charged same as prior orders 20(d), 21(f), and 22(d)

24. This shall be done at no cost to the customer unless the Court establishes a set fee for such an opt-out option which provides for the collection of money for a previously

16

supplied service by CPS Energy that was previously collected for in the past. And that cannot be raised without the court prior permission;

24. With respect to the Fifth Cause of Action (Unlawful Use of Customers' Property):

   (a) An order by the Court requiring CPS Energy to obtain written consent from all of its customers that have an electric Smart Meter installed on their property allowing CPS Energy to use that Smart Meter to provide Advanced Metering Infrastructure service to other customers;

   (b) An order by the Court providing that if a customer refuses such consent, CPS Energy shall disable the radio receiver and transmitter in the customer's Smart Meter at no cost to that customer;

   (c) An order by the Court requiring CPS Energy to obtain written consent as stated in 20.(a) above for all future electric Smart Meter installations or the radio receiver and transmitter must be disabled in the Smart Meter if the customer refuses such consent. This shall be done at no cost to that customer; and

   (d) An order by the Commission requiring PG&E to complete (a) and (b) above within one hundred and eighty (180) days from the effective date of this order.

25. With respect to the Sixth Cause of Action (Excessive Conduction):

   (a) An order by the Court requiring CPS Energy to have an independent

17

        laboratory test the General Electric and Itron electric Smart Meters before being installed while pending UL certification to determine the level of conduction to the electrical wiring in customers' homes as to ensure that it complies with FCC requirements;

    (b)    An order by the Commission requiring that this shall be accomplished in accordance with FCC protocol for conducting such tests, and the results shall be submitted to Complainant and the Court within one hundred and eighty (120) days from the effective date of this order; and

    (c)    An order by the Court stating that if the electric Smart Meters do not satisfy the requirements set forth in 25(a) above, CPS Energy shall make arrangements with General Electric and/or Itron to make the necessary modifications to their electric Smart Meters so they are compliant (this includes those that have already been installed by CPS Energy).

27.    With respect to the Seventh Cause of Action (Excessive RF Radiation):

    (a)    An order by the Court requiring CPS Energy to stop offering and installing the HAN feature for Smart Meter customers until such time as an assessment is made by an independent laboratory as to the health and safety issues that may be associated with the duty cycle of the separate RF transmitter for the HAN feature in the electric Smart Meter;

18

(b) An order by the Court requiring CPS Energy to have the same evaluation made for the router and Smart consumer appliances that would interact with each other and the electric Smart Meter;

(c) An order by the Court requiring CPS Energy to provide information to existing and prospective customers concerning possible health impacts, if any, of the HAN feature as determined in (a) and (b) above;

(d) An order by the Court requiring that all studies and notifications to customers shall be completed within 365 (days) from the effective date of this order; and

(e) An order by the Court requiring to charge the cost for the studies and customer notification to Executive's Bonus accounts as in prior orders 20(d), 20,(f),21(f), 22(d), and 23(e).

27. With respect to the Eighth Cause of Action (Failure to Investigate Customer Complaints):

Establish a company-wide policy for investigating customer complaints that Smart Meters installed on their property or nearby are causing them health problems. CPS Energy shall complete an investigation of the complaint within thirty (30) days of such notification, and provide a written report to the customer with a copy to the Complainant, and a copy to the court for the first 2 years to ensure compliance. And stating what was learned from visiting the customer's

  premises (and surrounding area), and what steps will be taken if a problem is discovered;

 (b) An order by the Court requiring CPS Energy in instances where there is a health issue to install an analog meter at no cost to the customer, and take any additional steps that are necessary to remedy the problem; and

 (c) An order by the Court requiring CPS Energy to pay a fine to the Court in an amount of $10,000 for each incident when the above requirements have not been satisfied. Such fines shall be charged to Executive's Bonus accounts as in prior orders 20(d),20(f), 21(f), 22(d),23 (e), and 26(e);

28.. With respect to the Ninth Cause of Action (ADA Violation):

 (a) An order by the Court requiring CPS Energy to investigate all claims by its customers that they are entitled to an ADA accommodation as such relief may relate to the installation of an electric Smart Meter or communications module on the gas meter on their premises or nearby;

 (b) An order by the Commission requiring CPS Energy to install an analog meter at the customer's request at no cost due to the medical condition;

 (c) An order by the Court requiring CPS Energy to pay a fine of not less than $10,000 for each incident where CPS Energy fails to provide the necessary accommodation to its customer that suffers from electromagnetic sensitivity paid as in orders 20(d),20(f), 21(f), 22(d),23 (e), 26(e), and 27(c); and

- (d) An order by the Commission requiring CPS Energy to investigate and resolve ADA complaints within thirty (30) days from the time a customer informs CPS Energy of a problem.

29. With respect to the Tenth Cause of Action (Customer Discrimination):

- (a) An order by the Court requiring CPS Energy to install an analog meter for any customer that is concerned about health issues, and does not want a Smart Meter installed on their property. This shall be done at no cost to the customer unless the Court approves an opt-out fee for this option;

- (b) An order by the Court requiring CPS Energy to accomplish this within thirty (30) days from the date a customer makes such a request; and

- (c) An order by the Court requiring CPS Energy to pay a fine of not less than $10,000 for each incident where CPS Energy discriminates against a customer by refusing to replace an electric Smart Meter and/or the communications module for the gas meter as requested and paid as in orders 20(d),20(f), 21(f), 22(d), 23(e), 26(e), and 27(c);

## PRAYER

WHEREFORE PREMISIS CONSIDERED Claimant moves this Honorable court to enter judgment by the Court awarding special and exemplary relief that may be awarded from NOTICE to President and CEO Doyle Benebe dated October 19, 2014 delivered by the Bexar County Sheriff on October 21, 2014, pain and suffering from retribution from having electric service forcibly removed by disconnection during the coldest months of

the year, mental anguish from being lead to believe claimant was having a heart attack then receiving a $43,000.00 hospital bill for 22 hours in the emergency room, damaged and removed personal property, audit of BPP account where claimant is owed in excess of $285.00 from advanced payment of service and fees, advocate's fees, and costs to Complainant for bringing this instant claim all of which is subject to admission of evidence supporting such claims to be presented at an evidentiary hearing that complainant moves the court be set for expedited hearing before trial

Such other and further relief as the Court may deem appropriate.

DATE: July 06, 2015                              /s/ Michael T. Paul
                                                 Pro Se Litigant
                                                 9123 Easy Street,
                                                 San Antonio, Texas 78266
                                                 (210)294-4533 cell  (830)438-4172 fax
                                                 mtp7389@hotmail.com