IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| Michael Thomas Paul, | § | |
| Plaintiff, | § § § | |
| v. | § § | CIVIL ACTION NO. |
| City of San Antonio, acting by and through City Public Service Board ("CPS Energy"), | § § § § | 5:15-CV-00173-DAE |
| Defendant. | § § § § | TRIAL REQUESTED |

## PLAINTIFF'S THIRD AMENDED COMPLAINT

1. Complainant, Michael T. Paul is a resident of Comal County Texas and occupant of premises at 9123 Easy Street, San Antonio, Texas 78266 that is deeded as Johnny H. and Shirley A Paul Trust.

2. Plaintiff and defendant entered into a contract for plaintiff to sell Net Metered excess generated power from solar array through an interconnect agreement dated August 9, 2013 which was signed by Adan V. Gonzales of CPS Energy and the Trust Administrator Scott A. Paul. (Contract attached as exhibit 1)

3. Upon information and belief defendant, City of San Antonio by and through the CPS Board, ("CPS Energy"), is a Texas Corporation having a place of business at 145 Navarro St, San Antonio, TX 78205.

4. CPS Energy supplies natural gas and retail electricity to over one million customers in 5 counties in central south Texas.

5. Defendant has designated Jackson Walker, LLC. Who has a business address of 112 E. Pecan Street, suite 2400, San Antonio, Texas 78205, as it's agent for service of process in Texas.

6. CPS Energy has installed thousands of Smart Meters to date along with a high power wireless mesh communications network that connects the electric Smart Meters to various collection points strategically located throughout its service territory. The customers' usage information and other customer's information is transmitted from the collection points to CPS Energy's computer center over a network used for electricity qualitycontrol, billing management, and possibly other purposes that are unknown.   **(EXHIBIT 2)**

7. As part of the mesh network, the electric Smart Meters act as a relay for each other so that when one meter is unable to communicate with the collection point, the data transmission is relayed by one or more of the other meters.

8. Both the Smart Meter and their collection points provide a bi-directional data communication that can be used to command/control and even reprogram as many as 5,000 electric Smart Meters and other programmable devices located in the same geographic area.

9. The gas Smart Meters communicate directly with CPS Energy's computer center over a separate network system.

10. CPS Energy's Project Manager Tracy Hamilton in an exclusive interview stated "Upon completion of the system-wide deployment, 740,000 smart electric- and 360,000 smart gas-meters will be in use by 2018".

11. The Smart Meter deployment program has drawn heavy criticism from CPS Energy's customers that are complaining about health and safety concerns and a number of other issues.

12. Most striking is the fact that when Smart Meters are installed on certain customers' homes, they become ill and, in some instances, it has become necessary for them to seek medical attention as has happened to Plaintiff.

13. There are also customers that have become disabled to the point that they are unable to work at their regular occupations.

14. CPS Energy has received letters from doctors explaining that there are people who suffer from electromagnetic sensitivity, and Smart Meters cause them harm.    **(EXHIBIT 3)**

15. CPS Energy has refused to acknowledge the medical facts and issues presented from doctors.

16. CPS Energy has taken no action to solve these harmful problems.

17. Customers have also sent letters to the Public Utility Commission. Unfortunately the PUC states that it lacks authority to command regulation or compliance of issues other than grid reliability. Plaintiff sent a letter that was responded with a statement that there was nothing the commission could do unless the issue involved the quality of the power being supplied to his residence.    **(EXHIBIT4)**

18. As a result, CPS Energy customers with grievances have no other recourse when the Utility ignores their complaints or acts adversely to them.

19. CPS Energy enjoys NO OVERSIGHT FROM ANY REGULATING AUTHORITY and has a MONOPOLISTIC hold on the residents of Bexar and the surrounding 4 counties that encompasses its 1,000,000 plus customer base. Plaintiff alleges Federal Sherman Act violations by CPS's actions to deny competition entry to the market by making a unanimous vote of the CPS board the only avenue to allow competition to enter. Coupled with requirements like the one published in the DER Manual that states "anyone that has a

solar producing system and wishes to sell it must give CPS Energy first right of refusal". These kinds of acts have forced everyone to accept the actions of CPS Energy with no recourse to go elsewhere for services if unhappy or treated adversley.

20. CPS Energy has allowed this situation to compound to the point where some customers have removed their Smart Meter, and installed an analog meter in its place.

21. CPS Energy has responded by threatening those customers with federal and state criminal prosecution for "tampering" with the meters, then proceed to disconnect their power for reasons other than non-payment. Plaintiff's service was terminated after he replaced his two meters in self defense and refused to allow the replacement of the same two smart meters that was demanded in an e-mail sent from Ms. Zandra Pulis Counsel for CPS Energy. There was no negotiation, no investigation of plaintiff's healh issues, or any other attempt to reach a safe conclusion of the microwave effect on plaintiff's health.  **(EXHIBIT 5)**

22. CPS Energy has chosen to ignore the public outcry, and continues to install Smart Meters.

23. This has led to protests by home owner associations, and surrounding cities official's objecting to Smart Meters being installed in their communities which created negative publicity in the media.

24. In addition, a number of counties in other states have enacted moratoriums in an attempt to stop Smart Meter installations in their jurisdictions, and many cities have joined in that effort by enacting ordinances to accomplish the same thing.

25. There is ongoing proposed legislation at the state level to try and resolve this controversy.

26. Despite all these problems, CPS Energy continues to claim that the Smart Meters are safe, and cause no health impacts or other problems.

27. CPS Energy's Opt Out program states "CPS Energy single family residential customers may exchange meters under the Smart Meter X-change Program. The customer's account must not have more than three (3) cut offs for non-payment in a twelve (12) month period in order to qualify for this Program. In order to maintain eligibility in this Program, the customer's account must not exceed three (3) cut offs for non-payment in a twelve (12) month period". **(EXHIBIT 6)**

28. *__Distributed Energy Resources (DER) customer accounts are ineligible for the X-change Program.__* Plaintiff having installed a 9.36 Kw Solar Photovoltaic system who agreed to sell excess generated real power to CPS Energy through an interconnect agreement was designated a D.E.R. and thus mandated by CPS Energy to use only their supplied digital microwave radiating data, command, and control meters that they had installed.

29. Unfortunately, there is no guarantee that the alternative proposed by plaintiff in an e-mail to CPS energy to disconnect the radio transmitter in the Smart Meters would be an adequate solution because, among other things, the Smart Meters in the customers' neighborhoods will still have radio frequency ("RF") transmitters.

30. This is extremely important for people that suffer from electromagnetic sensitivity because they have an adverse reaction when they are exposed to RF radiation levels that are substantially lower than current guidelines established by the Federal Communications Commission ("FCC").

### First Cause of Action

31. CPS Energy asserts, "RF EMITTED BY SMART METERS IS WELL BELOW THE LIMITS SET BY FEDERAL COMMUNICATIONS COMMISSION AND IT IS BELOW

LEVELS PRODUCED BY OTHER COMMON HOUSEHOLD DEVICES LIKE CELL PHONES, BABY MONITORS, SATELLITE TVS, AND MICROWAVES. IN FACT, YOU WOULD HAVE TO BE EXPOSED TO THE RF FROM A SMART METER FOR 375 YEARS TO GET A DOSE EQUIVALENT TO THAT OF ONE YEAR OF 15-MINUTES-PER-DAY CELL PHONE USE".

32. CPS Energy made this claim to the Plaintiff, other government agencies, its ratepayers, and the public at large and can be found @ https://www.cpsenergy.com/content/dam/corporate/en/Documents/SmartGrid/SGCCMythsvsFactsFactSheet.pdf .

33. This information was distributed as CPS Energy's "Smart Grid Initiative", and posted on its Web site. However, this representation is false. The fact is that the Smart Meters generate pulsed microwave RF energy. Therefore, CPS Energy's customers and the public at large are being exposed to significantly more RF radiation than they were led to believe.

34. Plaintiff having two different smart meters installed at his residence a General Electric I 210+C and an Itron Cintron, exposed him to significantly higher amounts and longer durations of exposure resulting in his suffering;

   a. nose bleeds multiple times a day,
   b. severe pain in both knees forcing him to seek medical relief which resulted in the ordering by his attending physician of two hinged orthopedic knee braces,
   b. suffered from blurred vision and difficulty reading TV-guide in livingroom requiring the use of a magnifying glass,
   c. severe short term memory loss and
   d. experiencing of severe jolts like an electric shock to his entire body just as he would start to fall asleep that would jerk him awake and made sleeping next to impossible.

35. Plaintiff was hospitalized on October 2, 2014 after having been rushed by ambulance to the North Methodist Hospital's Emergency Room with signs of a heart attack.

36. Plaintiff had collapsed at the Social Security office on Isom road and was experiencing a feeling of burning inside as if he were cooking from the inside out, along with the constricting of his chest preventing him from being able to take a breath.

37. After 22 hours and intravenous blood draws every half hour for the first 18 hours, multiple injections of different medications, two CAT scans, an MRI, numerous EKG's and a final chemically induced stress test the following day which showed no sign of cardiac issues, plaintiff was released with no diagnosis as to the cause of the event.

38. Plaintiff received charges totaling $43,000.00 for the 22 hour hospital visit plus an additional $1081.00 from the city of San Antonio for the Ambulance service. **(Exhibit 7)**

39. After returning home Plaintiff began investigating the symptoms' he had suffered for the prior two months and was surprised to learn that having a titanium plate implanted along the sciatic nerve of his right femur from an accident in 2007 that allowed for the absorption of radiant energy in the form of heat to his body from microwave radiated energy if he were exposed for too long a duration.

40. Plaintiff served notice filed in Bexar County district court to CPS Energy's CEO and President Doyl Benebe on October 19, 2014 requesting within 72 hours the removal of the transmitters from his residence.       **(Exhibit 8 - plaintiff incorporates the entire document and all claims into this petition as pleadings and seeks relief from there of.)**

41. By October 31, 2014, when the only response to plaintiff's request was a letter that stated plaintiff did not have a smart meter. Plaintiff replaced both with brand new GE analog meters.

42. On November 6th after expressly prohibiting the reinstallation of the two removed meters, electric service was disconnected, the two new meters plaintiff purchased were seized and stolen and lock out kits installed on the meter boxes which are tagged with RED tamper keys.

43. Disconnection of electric service was a malicious retaliatory act meant to injure the plaintiff whom suffered the loss of reliable power generation and storage from remote controlled system activity he had no control of.    **(EXHIBIT 9)**

44. Damage to water filtration equipment, and a circuit meter melting to the point of starting an electrical fire in the main service panel which would have been catastrophic had the plaintiff not been pro actively monitoring the equipment and wires by inspection on a daily basis after the water system was damaged.    **(EXHIBIT 10)**

### Second Cause of Action

45. CPS Energy has misled its customers as to whether their Smart Meters were registered with Underwriters Laboratories ("UL").

46. CPS Energy's customers have complained that the meters should be UL listed to protect their health and safety.  However,

47. CPS Energy has responded by claiming that such approval is not required because they are responsible for that oversight.

48. CPS Energy also claims that the Smart Meters that it is installing have never been registered with UL.

49. This representation is false. The fact is that some of the Smart Meters were registered with UL, and that registration was canceled by the supplier even though it was valid through 2012.

50. As a result, there is a serious question as to whether any of the Smart Meters CPS Energy has installed were tested safe by the Underwriters laboratory.

51. The use of an un certified electric meter on the Plaintiff's home is in violation of their home owner's insurance policy which requires only UL certified devices be connected.

### Third Cause of Action

52. CPS Energy has failed to inform its customers of the dangers of electric Smart Meters. As a result there are CPS Energy customers that have a meter installed on their property, which may present a risk to them and their families.

### Fourth Cause of Action

53. CPS Energy claims that the electric Smart Meters that it has installed meet FCC guidelines concerning maximum permissible exposure ("MPE") to RF radiation by its customers.

54. In fact, CPS Energy contends that such radiation is substantially lower than those requirements. However, the FCC's guidelines concerning MPE do not relate to electric Smart Meters that operate in the license-free portion of the spectrum.

55. Since there are no applicable MPE guidelines, CPS Energy has created a false sense of security for its CONSUMERS and the PUBLIC at large with statements like the one quoted in preceding paragraphs 31 & 32.

56. Plaintiff who has undergone invasive surgery and has a titanium plate with pins surgically implanted along the sciatic nerve of his right femur making him a sensitive receptor to

microwave radiation and is considered extremely harmful and life threatening for him to be exposed for anything other than limited, periodic, short term durations at extremely low power levels.

### Fifth Cause of Action

57. The Fifth Amendment to the United States Constitution prohibits the taking of private property for public use without just compensation.     **(EXHIBIT 11)**

58. This restriction is made applicable to the states by the fourteenth amendment prohibition against the deprivation of property without due process of law.

59. Since a federal question is presented, it would seem to be beyond dispute that an action for Just Compensation resulting from the taking of private property for public use would lie in the federal courts.

U.S. Const. Amend. V

"No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation unless there is the consent of such person...."

Tex. Const. Art. I, § 17

60. By utilizing command and control protocols programmed into the inverter as a federal IEEE certification requirement that was accessed without authorization thru wireless commands that appear on the event log of plaintiff's system as "REMOTE" entries, CPS Energy was able to control Plaintiff's solar inverter limiting actual generation of power that was produced and to effect control over entire system to utilize the Smart Inverter for purposes other than agreed buying of Plaintiff's excess generated real power not consumed on the premises. **(EXHIBIT 12)** Hacking of a protected system

computer fraud and abuse act **18 U.S.C. § 1030 (4)** knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period;

61. The unauthorized use of the Plaintiff's equipment by CPS Energy to balance the feeder's real power (volts) and reactive power (voltAmp reactive) during the day instead of inverting solar energy to real energy and the use of the equipment in the middle of the night when all should be powered down **(Exhibit 13)** constitutes a partial taking claim that interfered with the intended use and contracted operation of the solar system beyond what was being compensated for but had a public benefit that was taken without knowledge or consent.

62. Upon realizing the scope of the takings the Plaintiff sent a letter requesting either to cease and desist or agree to a new contract that would compensate for the extra hours of ware and tare to the system including the battery bank which only has a finite discharge recharge lifespan that was being depleted on a daily basis faster than the original time schedule estimate calculated as these extra hours of use were not accounted for.

63. Due to the Smart Inverter having a built in charger every time the system received a remote system power up the programming would automatically set the programmed setting of charging the batteries TO PURCHASE grid power overriding the set programming of charging from the solar array.

64. The remote power ups would usually occur in the mid to late afternoon when prices were at the highest to be buying power listed as Peak Rates on bills. **(Exhibit 14)**

65. Plaintiff installed solar system to sell excess power not to have system remotely accessed every day that forced him to buy power back at a rate for more than he had sold it at or for any other Ancillary Services CPS Energy saw fit to take.

66. The Months of April and May plaintiff realized a ZERO electric bill and was to be compensated for over generated power at the retail rate per KWh but was actually credited $.0165 from CPS Energy.   **(EXHIBIT 15)**

67. When enquired of CPS Energy as to the discrepancy. Plaintiff was told that the rate was the avoided fuel cost rate that is to be paid and that was all he would receive.

68. President and CEO Doyle Benebe in a press release from July, 2013 made the statement that the proposed changes to the NET Metering program that was to change the then current NET metered rate of $.097 per KWh to a new program called solar credits had been placed on hold and that any distributed energy solar photovoltaic system commissioned before July 2014 would be considered grandfathered and receive the $.097rate. **(Exhibit 16)**

69. **18 U.S. Code § 2510 (21)(A)** "Computer trespasser" means a person who accesses a protected computer without authorization and thus has no reasonable expectation of privacy in any communication transmitted to, through, or from the protected computer. As such any and all request for discovery must be complied with.

70. **18 U.S. Code § 1030 (a)(2)(c);** Whoever- intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains-information from any protected computer;

71. **18 U.S. Code § 1030 (a)(4);** knowingly and with intent to defraud, accesses a protected

computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period;

72. **18 U.S. Code § 1030(a)(5)(A);** knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer;

73. **18 U.S. Code § 1030 (b);** Whoever conspires to commit or attempts to commit an offense under subsection (a) of this section shall be punished as provided in subsection (c) of this section.

74. **18 U.S. Code § 1030 (c)(2)(ii),(4)(I)(III);** The punishment for an offense under subsection (a) or (b) of this section is—(I) loss to 1 or more persons during any 1-year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value; the offense was committed in furtherance of any criminal or tortious act in violation of the Constitution or laws of the United States or of any State; <u>physical injury to any person</u>.

80. **18 U.S. Code § 1030(e)(1),(2)(b),(6),(8),(11),(12)(g);** As used in this section— the term "computer" means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device; the term "protected computer" in this instance means a computer which is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner

that affects interstate or foreign commerce or communication of the United States; the term "exceeds authorized access" means to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter the term "damage" means any impairment to the integrity or availability of data, a program, a system, or information; ) the term "loss" means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service; and (12) the term "person" means any individual, firm, corporation, educational institution, financial institution, governmental entity, or legal or other entity; **(g) Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief.** A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses [5] (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i). Damages for a violation involving only conduct described in subsection (c)(4)(A)(i)(I) are limited to economic damages. No action may be brought under this subsection unless such action is begun within 2 years of the date of the act complained of or the date of the discovery of the damage. No action can be brought under this subsection for the negligent design or manufacture of computer hardware, computer software, or firmware.

### Sixth Cause of Action

75. **18 U.S. Code, Part 1, Chapter 1119 - WIRE AND ELECTRONIC COMMUNICATIONS INTERCEPTION AND INTERCEPTION OF ORAL COMMUNICATIONS** "Smart Meters" and digital utility meters meet the statutory definition of unlawful surveillance devices put forth as "Wiretapping" in **United States**

Code (USC) Title 18, Part 1, Chapter 1119, Sec 2511 (1) Except as otherwise specifically provided in this chapter any person who— (b) intentionally uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any or communication when— (ii) such device transmits communications by radio, or interferes with the transmission of such communication; (iv) (B) obtains or is for the purpose of obtaining information relating to the operations of any business or other commercial establishment the operations of which affect interstate or foreign commerce and other State and Federal laws.

76. These meters are designed and intended to record events and activities within private structures and properties which constitutes violations of the **United States Constitution, Bill of Rights, 4th Amendment** guaranteeing all people to be "...secure in their persons, houses..." and to be free of "search". No search of private property may be lawfully done without a valid, timely and ratified court order (warrant) based on probable cause or by congressional legislation or statute.

77. And may also be in be in violation of the Privacy Act of 1974 TITLE 5- PART I- CHAPTER 5- SUBCHAPTER II-Sec. 552a. Records maintained on individuals. (b) Conditions of Disclosure.--No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be-

(1) to those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties;

(2) required under section 552 of this title;

(3) for a routine use as defined in subsection (a)(7) of this section and described under subsection (e)(4)(D) of this section;

4) to the Bureau of the Census for purposes of planning or carrying out a census or survey or related activity pursuant to provisions of title 13;

5) to a recipient who has provided the agency with advance adequate written assurance that the record will be used solely as a statistical research or reporting record, and the record is to be transferred in a form that is not individually identifiable;

(6) to the National Archives and Records Administration as a record which has sufficient historical or other value to warrant its continued preservation by the United States Government, or for evaluation by the Archivist of the United States or the designee of the Archivist to determine whether the record has such value;

(7) to another agency or to an instrumentality of any jurisdiction within or under the control of the United States for a civil or criminal law enforcement activity if the activity is authorized by law, and if the head of the agency or instrumentality has made a written request to the agency which maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought;

(8) to a person pursuant to a showing of compelling circumstances affecting the health or safety of an individual if upon such disclosure notification is transmitted to the last known address of such individual;

(9) to either House of Congress, or, to the extent of matter within its jurisdiction, any committee or subcommittee thereof, any joint committee of Congress or subcommittee of any such joint committee;

(10) to the Comptroller General, or any of his authorized representatives, in the course of the performance of the duties of the Government Accountability Office;

(11) pursuant to the order of a court of competent jurisdiction; or

(12) to a consumer reporting agency in accordance with section 3711(e) of title 31.

78. TEXAS LAW states it is unlawful to transmit a customer's information to those not authorized to receive it absent the originating customer's consent. **Texas H.B. No. 2129** was passed by the House on April 13, 2005 and passed by the Senate, with amendments, on May 24, 2005. **(Exhibit 17)**

Specific amounts of loss and damages from the accounting of the plaintiff's account with CPS can only be determined after discovery of all financial data and the amounts that were credited and a true accounting off all money and credits exchanged during the course of business between the plaintiff and defendant.

The actual replacement costs of the Solar Equipment and other damaged systems to date includes $1285.00 for a 6000watt inverter instead of the original 8000 watt as that was all the plaintiff could afford, $300 for the replacement of 1 6volt 225Amp hour AGM Solar battery that would no longer rise above 4.2 volts. $606.00 for replacement of damaged gas generator. Incidental costs from being forced off the grid include; having to purchase a propane heater for indoor use during the winter at a cost of $179 plus LPG for heating costing $15.00 per tank that would last 3 days. 10 tanks bought from Amerigas for $150.00. Automobile gas to travel the 30 mile round trip to replace LPG $20.00. $360.00 for Plaintiff to replace all the

lighting in his home with LED low watt energy efficient bulbs, changed from a two burner AC hot plate to a single plate NU Wave induction heating plate, an Infer red energy efficient space heater both purchased on credit from FINGERHUT and began using an integrated 10,500 BTU all season SOLEUSAIR heat pump heater and 10,000 BTU A/C cooling dehumidifier that is the most energy efficient on the market requiring 1256 watts cooling on 115 volt ac. All necessary from being forced to live off grid. Plaintiff had to become energy efficient in the extreme especially due to the reduced amount of power available on a daily basis from to the battery system not receiving full recharges from November through the end of January when Inverter was still receiving REMOTE signals that reset batteries to charge from the grid when there was none. The costs to repair the damage to the water supply and storage on the property was a loss of $495+tax for the Whirlpool water softener, $299+tax under sink reverse osmosis filtration system. $95.00 whole home sediment filters x 3 (1 in the pump house after the Terminox Iron Filtration system and before the softener, 2 in the water supply lines of the cold and hot water in the home).

$245.00 for the purchase and installation of chemical injector and concentrated bromine chlorine to decontaminate the house water lines. $75.00 to purchase additional electrical supplies to rework installation of Solar Photovoltaic system from a 48 volt DC based system to a 24 volt. $180.00, for the loss of all food in refrigerator and freezer that spoiled when electric service was disconnected on November 6, 2014. $250.00 for two brand new GE Analog kilowatt hour meters purchased on the internet thru Amazon.com that were removed from the plaintiff's property by CPS Energy at the time of disconnection. Any and all future losses and costs from which plaintiff will have to incur expense due to this case.

**Conclusion and Prayer**

Wherefore Plaintiff re-states his **Request for Jury Trial and** denies referral of causes before the Federal Magistrate. Plaintiff further prays the court to award all compensatory damages and injunctive relief or other equitable relief to which plaintiff is rightfully entitled for all causes of action as stated in this pleading.

                                                      Respectfully submitted,

                                                /s/ *Michael Thomas Paul*

*Pro Se* Litigant
9123 Easy Street
San Antonio, Texas 78266
(210)294-4533
mtp8389@gmail.com

Due to strenuous financial burden placed on the plaintiff having to prosecute this cause pro se, production of exhibits to be filed will be costly and timely. Plaintiff will file exhibits as supplemental to this filed petition by September 7, 2015 and has filed a motion for extension of time to file amended complaint with the court.

                                                /s/ *Michael Thomas Paul*
                                                Pro Se

## CERTIFICATE OF CONFERENCE

I certify that on August 19th, 2015, I spoke with attorney for the Defendant Mr. Matthew Eric Vandenberg and we discussed the filing of a corrected Third amended petition as was discussed in the hearing regarding the required Rule 26(f) conference in response to my verbal request to amend the current supplement to the second amended pleading.

Co Counsel stated that a written request was in order and that I should attach a copy of the proposed amended pleading with the request before they would approve the filing with the court.

On August 30th I submitted a copy of this amended complaint to the defendant's attorney who states that they are unable to make a determination as to approval since the exhibits are as of yet not available and the complaint has incorporated one of the exhibits directly into the pleading. However I reiterated to co counsel they already are in possession of the document in question from earlier filings in both the 225th and 247th State courts.

/s/ Michael Thomas Paul
Michael T. Paul

## CERTIFICATE OF SERVICE

I hereby certify that on the 31ST day of August 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system through which a copy was served upon:

Jeffrey T. Harvey
State Bar No. 6011139
jharvey@jw.com
Matthew E. Vandenberg State
Bar No. 24079501
mvandenberg@jw.com
JACKSON WALKER L.L.P.
112 E. Pecan Street, Suite 2400
San Antonio, Texas 78205
Telephone: (214) 953-6000
Facsimile: (214) 953-5822

/s/ Michael Thomas Paul
Michael T. Paul